**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEIDOS SECURITY DETECTION & AUTOMATION, INC., <br><br>                           Plaintiff, <br><br> -against- <br><br> MERCURY SYSTEMS, INC., <br><br>                           Defendant. | Civil Case No. __24 Civ. 336__ <br><br> **COMPLAINT** |

Plaintiff, Leidos Security Detection & Automation, Inc. ("Leidos" or "Plaintiff"), by and through its attorneys Reed Smith LLP, hereby alleges against Defendant, Mercury Systems, Inc., ("Mercury" or "Defendant"), as follows.

## NATURE OF ACTION

1. This declaratory judgment action arises out of Leidos' termination of two purchase orders due to Mercury's failure and inability to timely deliver conforming and non-defective components. Specifically, Leidos seeks a declaration that its termination of two purchase orders issued pursuant to and governed by the parties' Letter Agreement ("Letter Agreement" attached hereto as **Exhibit 1**) was for "default" due to Mercury's non-performance and not, as Mercury erroneously contends, for "convenience." There is a ripe and justiciable controversy between the parties on this issue.

2. Leidos's predecessor-in-interest, L3 Security & Detection Systems, Inc., ("L3 SDS"), and Mercury entered into the Letter Agreement, under which Mercury was required to manufacture and supply antenna modules ("Modules") for Leidos' Pro Vision 3 ("PV3"). The PV3 is an advanced people screening system used at a variety of security checkpoints, including airports, manufacturing facilities, government buildings, nuclear power plants, and correctional institutions.

1

3. From the outset, Mercury's performance was riddled with problems. Mercury could not meet agreed development and delivery timelines, and it repeatedly (and admittedly) struggled to meet Leidos' product specifications and deliver conforming Modules. Despite being given repeated opportunities to fix its performance issues, Mercury failed to do so.

4. Accordingly, Leidos put Mercury's work on hold, and then in February 2023, Leidos terminated two purchase orders issued under the Letter Agreement. Leidos' termination was for default under Section 11 of the Letter Agreement's terms and conditions, which permitted Leidos to terminate the purchase orders without liability if Mercury (i) failed to deliver the Modules on time, (ii) jeopardized the schedule, or (iii) otherwise breached the Letter Agreement, including by delivering non-conforming Modules.

5. Although Mercury breached all three of these requirements, Mercury claims that Leidos' termination was one for "convenience" under Section 10 of the Letter Agreement's terms and conditions, and not for "default" under Section 11. For a termination for convenience, Mercury is entitled under Section 10 to recover its "actual, reasonable, substantiated and allowable costs," as negotiated between the parties, subject to a contractual cap. Mercury has demanded millions in alleged costs and expenses as its termination for convenience fee.

6. An actual justiciable controversy has therefore arisen between the parties as to whether Leidos' termination of the purchase orders was for default or for convenience. Whereas Leidos contends that the termination was for default based on Mercury's failure to timely deliver conforming Modules and it has no liability to Mercury for its costs, Mercury contends the termination was for convenience and has threatened Leidos with legal action if Leidos does not reimburse Mercury for its alleged costs (and more).

7.  Mercury has left Leidos with no choice but to file this action to obtain a declaration of its right to terminate the purchase orders for default without liability to Mercury. Such a declaration is necessary to resolve the parties' dispute and to allow for the parties to ascertain their respective rights and obligations under the Letter Agreement.

## PARTIES

8.  Leidos is a Delaware corporation with a principal place of business located at 1750 Presidents Street, Reston, Virginia 20190.

9.  Upon information and belief, Mercury is a Massachusetts corporation with its principal place of business located at 50 Minuteman Road, Andover, Massachusetts, 01810.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because the parties are diverse in citizenship (*see supra* ¶¶ 8-9) and the amount in controversy exceeds $75,000, exclusive of interest and costs, as Mercury claims entitlement to reimbursement of millions in costs in the event Leidos' termination is held to be for convenience.

11. The parties are subject to the personal jurisdiction of this Court because they agreed in the Letter Agreement that "[a]ll disputes arising out of or related to this Subcontract will be subject to the exclusive jurisdiction and venue of the state and federal courts located in State of New York and the Parties hereby consent to such jurisdiction and venue."

12. Venue is proper under 28 U.S.C. § 1391(b)(3).

## FACTS

**A.  The Letter Agreement and Leidos' Termination Rights**

13. Leidos is a global leader in the integration and application of information technology, engineering, and science whose core mission statement aims to make the world safer, healthier, and more efficient.

3

14. Leidos provides essential services and support to the United States Government, several of its agencies, and various other industries in the private sector, to help solve the nation's toughest challenges facing the defense, intelligence, homeland security, civil, and health markets. In doing so, Leidos helps safeguard the safety of the American public.

15. L3 SDS and Mercury entered into a Letter Agreement, dated December 27, 2019, under which, among other things, Mercury agreed to manufacture and supply the Modules. L3 SDS's General Terms and Conditions for Supply & Services Contracts (the "Terms & Conditions") are incorporated into the Letter Agreement. (*See* Ex. C to the Letter Agreement.)

16. The Terms & Conditions made explicit that time was of the essence with respect to Mercury's performance obligations. Specifically, Section 3 of the Terms & Conditions provides:

> Seller shall strictly adhere to all Subcontract schedules. <u>Time is and shall remain of the essence in the performance of this Subcontract</u>. Seller shall notify Buyer in writing immediately of any actual or potential delay to the performance of this Subcontract. Such notice shall include a revised schedule and shall not constitute a waiver to Buyer's rights and remedies hereunder.

(Ex. 1, Terms & Conditions (Ex. C) § 3) (emphasis in original).[1]

17. In addition to agreeing to perform in a prompt and timely manner, Mercury warranted in Section 16 of the Terms & Conditions that the Modules it manufactured and delivered to Leidos would be non-defective and would conform with Leidos' contractual specifications. (Ex. 1, Terms & Conditions (Ex. C), § 16(a).)

18. Neither Section 3 nor Section 16 of the Terms & Conditions could be waived without a writing signed by both parties. (Ex. 1, Terms & Conditions (Ex. C), §§ 39-40(a).)

---

[1] The Letter Agreement's Terms & Conditions defines "Subcontract" as "the Purchase Order, Subcontract, or Contract, these General Terms and Conditions, and any special conditions appended hereto or documents incorporated herein." (Ex. 1, Terms & Conditions (Ex. C), § 1(m).)

19. There are two ways in which Leidos could terminate the Letter Agreement in whole or in part: either for "default" under Section 11 of the Terms & Conditions or for "convenience" under Section 10.

20. Section 11 of the Terms & Conditions is entitled "Termination for Default" and provides:

> Buyer may, by written Notice of Default to Seller, terminate this Subcontract in whole or in part if the Seller fails to: (i) deliver the Goods or perform the Services within the time specified in this Subcontract or any extension . . . or (iii) perform any of the other provisions of this Subcontract.

(Ex. 1, Terms & Conditions (Ex. C), § 11(a).)

21. For a termination for default, Leidos is only required to compensate Mercury at the contract price for completed PV3 Modules which are delivered to and accepted by Leidos. Leidos has no obligation to compensate Mercury for costs related to partially completed goods and raw materials unless Leidos elects to require Mercury to transfer title such goods and raw materials. (*Id.* at § 11(b).)

22. Similarly, to the extent applicable, Exhibit D to the Letter Agreement relieves Leidos of all liability for damages if Mercury failed to deliver conforming Modules:

> For the avoidance of doubt, L3 SDS will have no liability under the Letter Agreement in the event the Product is not compliant to the Specifications or the parties are unable to reach an agreement with regard to the liquidated damages clause.

(Ex. 1, Anticipated Schedule of Activities (Ex. D).)

23. Section 10 of the Terms & Conditions is entitled "Termination for Convenience" and provides:

> (a) Buyer may, by notice in writing, direct Seller to terminate work under this Subcontract in whole or in part, at any time, and such termination shall not constitute default. In such event, Buyer shall have all rights and obligations accruing to it either at law or in equity, including Buyer's rights

> to title and possession of the goods and materials paid for. Buyer may take immediate possession of all work so performed upon notice of termination.
>
> (b) Seller shall immediately stop work and limit costs incurred on the terminated work.

(*Id.* at Ex. C § 10(a)-(b).)

24. Upon a termination for convenience, Leidos is required to reimburse Mercury "for the actual, reasonable, substantiated and allowable costs with the total amount to be paid…being determined by negotiation" less "any amount(s) previously paid" by Leidos. (*Id.* at § 10(c).) Such reimbursement shall not exceed the value of the Letter Agreement. (*Id.*)

**B.      Mercury Materially Breaches the Letter Agreement**

25. Leidos issued two purchase orders for the Modules: (a) Purchase Order ZPFL015500, dated November 26, 2019, attached hereto as **Exhibit 2**; and (b) Purchase Order ZPFL015709, dated December 23, 2019, attached hereto as **Exhibit 3** (together, the "Purchase Orders").)

26. Mercury repeatedly breached the Letter Agreement and the Purchase Orders by: (a) failing to deliver the Modules on time; and (b) delivering Modules that failed to conform to Leidos' product specifications.

27. Mercury failed to deliver a significant number of Modules according to dates called for in the Purchase Orders, despite time being explicitly of the essence under Section 3 of the Terms & Conditions.

28. Mercury's difficulty satisfying delivery dates was a topic of frequent discussion during the parties' weekly status meetings and documented in Mercury's PV3 Program Status Meeting PowerPoints.

29. To illustrate, Mercury set forth in a July 9, 2020 PowerPoint ("July 9 PowerPoint") the delivery schedule for six tranches of Modules and acknowledged its inability to meet the "Contract Date" of May, 22, 2020 for all six tranches.

30. According to Mercury's forecasts in the July 9 PowerPoint:

    (a) 10 Modules would not be delivered until September 1, 2020;

    (b) 20 Modules would not be delivered until September 30, 2020;

    (c) 30 Modules would not be delivered until November 4, 2020;

    (d) 40 Modules would not be delivered until December 7, 2020;

    (e) 100 Modules would not be delivered until January 8, 2021; and

    (f) 100 Modules would not be delivered until February 5, 2021.

31. Subsequently, in a January 5, 2021 PowerPoint, Mercury acknowledged further delivery delays to the Modules originally discussed in the July 9 PowerPoint. Once again, all Modules had a "Contract Date" of May 22, 2020.

32. According to Mercury's revised forecast:

    (a) Mercury delivered the first tranche of 10 Modules in October 2020 (rather than on September 1, 2020, as stated in the July 9 PowerPoint);

    (b) Mercury delivered the next 11 Modules on December 26, 2020 (rather than on September 30, 2020, as stated in the July 9 PowerPoint); and

    (c) Mercury would not deliver the remaining 270 Modules until between January 29, 2021 and April 30, 2021 (rather than between September 30, 2020 and January 8, 2021, as stated in the July 9 PowerPoint).

33. Ultimately, despite repeated attempts to work with Mercury regarding schedules, Mercury failed to make timely deliveries of a substantial number of Modules that Leidos purchased pursuant to Purchase Order ZPFL015500, missing delivery dates on some occasions by several months, and failing to deliver some of the Modules altogether. All told, Mercury delivered on time a mere 15% of the Modules pursuant to Purchase Order ZPFL015500.

34. Furthermore, Mercury did not deliver any Modules under Purchase Order ZPFL015709.

35. Mercury's failure to adhere to critical required production and delivery deadlines constituted a material default under both the Purchase Orders and the Letter Agreement, thereby permitting Leidos to terminate the Purchase Orders for default pursuant to Section 11(a) of the Terms & Conditions.

36. Compounding these problems, the Modules that Mercury did ultimately, albeit untimely, deliver failed to conform to Leidos' required product specifications.

37. Like the delivery delays, Mercury's issues with achieving specifications compliance and product failures were detailed in its PV3 Project Status Meeting PowerPoints. For example, Mercury noted in a February 11, 2020 PowerPoint that prototype Module units needed to be returned to Mercury for rework, and details the need for FPGA (Field Prog Gate/Grid Array) removal and PCB (Printed Circuit Board) troubleshooting, which contributed to cause delivery delays.

38. Mercury's issues continued. Mercury's July 9 PowerPoint identified specific "Risks/Concerns" with the Modules project, including FPGA failures requiring investigation by Mercury.

39. An October 27, 2020 PowerPoint noted an ongoing failure analysis needed for "non-functioning hardware." The same issue and failure analysis still appeared on the January 5, 2021 PowerPoint.

40. Although Leidos attempted to send Modules back to Mercury for additional rework, Mercury never managed to correct the persistent non-conformities and demonstrate an ability to supply conforming, functioning products.

41. Indeed, Leidos was never able to use a single Module produced by Mercury in production PV3 units.

42. Mercury's failure in this regard constituted a breach of the Letter Agreement, and provided an additional and independent basis for Leidos to terminate the Purchase Orders for default pursuant to Section 11(a) of the Terms & Conditions.

43. In sum, Mercury (1) failed to deliver Modules according to the times called for in the Letter Agreement and Purchase Orders; (2) failed to deliver Modules that conformed with required specifications; and (3) failed to make sufficient progress on correcting the delays and remedying the non-conformities so as to endanger performance of the Letter Agreement and Purchase Orders.  Those breaches and failures, individually and collectively, were sufficient for Leidos to terminate the Purchase Orders for default pursuant to Section 11 of the Terms & Conditions, which, as alleged above, permits a termination for default in the event Mercury fails to "(i) deliver the Goods or [] perform the Services within the time specified in this Subcontract or any extension; (ii) make progress, so as to endanger performance of this Subcontract; or, (iii) perform any of the other provisions of this Subcontract."  (Ex. 1, Terms & Conditions (Ex. C.) § 11(a).)

C.  **Leidos Terminates the Letter Agreement and Purchase Orders for Default**

44. Despite Leidos' attempts to assist Mercury in overcoming its performance issues, over time, it became apparent that Mercury would not be able to reliably perform its obligations under the Letter Agreement and Purchase Orders.

45. Accordingly, by letter dated February 24, 2023, Leidos terminated the Purchase Orders for default under Section 11(a) of the Terms & Conditions (the "Termination Notice").

46. As explained in the Termination Notice and subsequent correspondence between the parties, Leidos' termination for default was justified under the Letter Agreement for several reasons.

47. First, Mercury's late delivery of Modules past scheduled deadlines and failure to deliver other Modules pursuant to the dates reflected in the Purchase Orders justified termination for default under Section 11(a) of the Terms & Conditions.

48. Second, Mercury's failure to comply with contractual specifications and supply conforming Modules created an independent reason to terminate based on Mercury's default.

49. As Leidos explained in correspondence related to its termination for default, Mercury's own correspondence, including the PowerPoints identified in paragraphs 29-32 and 37-39 above, confirm that Mercury was producing non-conforming PC boards, an essential component of the Modules. Leidos also pointed to the FPGA issues, which necessitated extensive and lengthy troubleshooting.

50. As Leidos also explained in its correspondence, because its termination was for default, and because it elected to not receive or take title to any complete or partially-finished Modules and raw materials, it has no liability to Mercury under the Letter Agreement arising from its termination of the Purchase Orders.

**D.     Mercury Disputes Leidos' Ability to Terminate for Default**

51. After receiving the Termination Notice, Mercury disputed Leidos' right to terminate the Purchase Orders for default.

52. It is Mercury's stated position that Leidos' termination must be one for convenience, governed by Section 10 of the Terms & Conditions, and that as a result, Mercury is entitled to substantial compensation for certain costs and expenses.

53. Indeed, Mercury has demanded millions of dollars from Leidos to cover its alleged material costs and expenses.

54. Mercury's demands, to date, have been in excess of what Mercury potentially could be entitled to under the termination for convenience section of the Terms & Conditions, which limit recovery to "actual, reasonable, substantiated and allowable costs" less any amounts previously paid, with the total recovery to be determined through negotiation between the parties (and subject to a contractual cap). (Ex. 1, Terms & Conditions (Ex. C) § 10(c).)

55. The parties remain at an impasse regarding the nature and consequences of Leidos' termination.

56. In recent post-termination dispute correspondence, Mercury has threatened to file suit against Leidos if it does not (1) change its termination notice from a termination for default to termination for convenience; and (2) pay Mercury millions in unsubstantiated and inflated costs and fees.

57. As a result, Leidos is compelled to seek a declaration from this Court that its February 24, 2023 termination was properly characterized as a termination for default based on Mercury's failures to timely deliver Modules that conformed to Leidos' specifications and that it has no liability to Mercury under the governing termination for default provision of the Letter Agreement.

**FIRST CAUSE OF ACTION**
(Declaratory Judgment)

58. Leidos repeats and realleges the allegations set forth in each of the preceding paragraphs of this Complaint as if fully set forth herein.

59. An actual, justiciable controversy exists between Leidos and Mercury concerning Leidos' rights with respect to termination under the Letter Agreement, and the parties' respective rights and obligations flowing from Leidos' February 24, 2023 termination of the Purchase Orders.

60. Leidos contends that, based on Mercury's failure to make timely deliveries of specifications-compliant Modules, it was entitled to terminate the Purchase Orders for default, and as such, the parties' rights and obligations are governed by Section 11 of the Terms & Conditions.

61. Mercury, in contrast, disputes that Leidos was permitted to terminate for cause, and has repeatedly insisted that termination should be construed as for convenience and that it is entitled to substantial payment from Leidos under Section 10 of the Terms & Conditions as a result.

62. As such, the parties' interests and positions are directly adverse.

63. There is a bona fide, actual, present practical need for the declaration Leidos seeks given Mercury's wrongful refusal to acknowledge the basis of termination claimed by Leidos and repeated demand for payment of costs. Moreover, part of the costs to which Mercury has claimed it is entitled to reimbursement are storage costs, which will only continue to accrue if the termination dispute is not resolved. Thus, the declaration Leidos seeks is needed to establish the parties' prospective rights and obligations.

64. The declaration Leidos seeks deals with a present, ascertained or ascertainable state of facts, and the parties' rights and obligations under the Letter Agreement with respect to termination are dependent upon the facts and the law applicable to those facts.

65. Leidos is therefore entitled to an order from this Court adjudging and declaring that: (a) Leidos properly and validly terminated the Purchase Orders issued under the Letter Agreement

for default pursuant to Section 11(a) of the Terms & Conditions; and (b) Leidos is not liable for payment of any costs or expenses under Section 10(c) of the Terms & Conditions.

## PRAYER FOR RELIEF

**WHEREFORE**, Leidos demands judgment in its favor as follows:

(a) On Plaintiff's First Cause of Action for the issuance of a Declaratory Judgment, issuing and entering an order adjudging and declaring that: (a) Leidos properly and validly terminated the Purchase Orders for default pursuant to Section 11(a) of the Terms & Conditions; and (b) Leidos is not liable for payment of any costs or expenses under Section 10(c) of the Terms & Conditions or for payment of Mercury's alleged "fully burdened material costs"; and

(b) Granting Leidos such other and further relief as this Court deems just and proper.

Dated: New York, New York
January 16, 2024

**REED SMITH LLP**

By: */s/ John C. Scalzo*
John C. Scalzo
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 521-5400
jscalzo@reedsmith.com

Karlin E. Sangdahl (*pro hac vice* application forthcoming)
10 South Wacker Drive, 40th Floor
Chicago, IL 60606
Telephone: (312) 207-1000
ksangdahl@reedsmith.com

*Attorneys for Plaintiff Leidos Security Detection & Automation, Inc.*